I would like for the attorneys to step up to the podium. Tell me your name, whom you represent, and approximately how long your argument will take. Please step to the podium. Good morning, Counsel. Good morning, Your Honors. Jessica Weir, on behalf of the Office of the State Appellate Defender. I represent the appellant, Mr. Corvatus Green, and I would like about 15 minutes and 5 for rebuttal. Very good. Good morning, Counsel. Good morning, Your Honors. Assistant State's Attorney Alan Spellberg, representing the people of the State of Illinois. Approximately 15 minutes for our response, Your Honor. Very good. Ms. Weir, you may proceed with your argument. Thank you. Your Honors, today I would like to focus my argument on the issue raised in the supplemental brief, and that is the impact of the Supreme Court's recent decision in People v. Chires on the instant case. On February 1st of this year, the Illinois Supreme Court in People v. Chires held that the former 2012 unlawful use of a weapon statute that prohibits the possession of firearms within a thousand feet of a park was unconstitutional. In this case, Mr. Green was convicted of possessing a firearm within a thousand feet of a school. Now, although the Chires court did not decide whether or not the school zone ban was unconstitutional, it's clear from the reasoning in Chires that the school zone ban is as unconstitutional as the park zone ban. First of all, under the reasoning of Chires, the school zone ban imposes what the Chires court calls a severe burden on the core Second Amendment right to possess weapons in public for self-defense, where confrontation is most likely to occur. The Chires court found that the restriction placed a severe burden on this core right because the former UUW statute that we're talking about today was a categorical prohibition that did not have an exception for law-abiding adults. And the same is true for the school zone ban. The school zone ban issue of this case, the 2012 version, was a categorical prohibition that did not contain an exception for law-abiding adults. Now, would you take the position that a law-abiding adult with an FOID card is entitled to stand at the entrance of a school at dismissal time with a weapon? Well, no. Even under the Concealed and Carry Act, which is the exception to the UUW statute, people who are licensed to carry guns still cannot come onto school property. They can't come onto the playground. They can't come onto the parking lot. So they still have to keep a distance. So some parking lots are quite large. They can be the length of a football field. It's okay for the legislature to say it can't be on any school property. That is, no playing fields, no parking lots, no entrances, exits, anything that's designated as school property. Correct. And you would concede that that's all right? Correct, yes. Okay. Yes. Well, how do you get there? Because there isn't, when it says schools, how do you interpret that as meaning not only the buildings, but property surrounding the building, including parking lots, playgrounds? Right. Well, when you look at the Concealed and Carry Act, it has prohibited areas that are listed on there. One of them is the real property of the school, which includes parking lot, playground, and, of course, inside of the school as well. So I'm kind of incorporating the Concealed and Carry Act, which the amended version of the UUW statute, which has an exception for people that have licenses under the Concealed and Carry Act, creates an exception for licensed adults, those who are mentally healthy, those who are not felons, are not juveniles. It allows for those particular people who do not pose a great risk to the safety of children to exercise their Second Amendment rights in those areas. Harmonize for me the concession that the legislature can validly ban even people lawfully permitted to carry weapons from any school property, which can be a substantial area, with your client's conduct in being 97 feet from a school entrance armed with a weapon. Well, at the time of the offense in this case, the law was such that there was no exception to the school zone. Right. He was not on the real property of the school. He was always across the street from the school, either in his car or talking to various persons. Now, there's nothing wrong with having a buffer zone around the school. CHIRES does not indicate or suggest that there is anything wrong with having a buffer zone outside the school. The problem comes in when it's a categorical prohibition. And what CHIRES found was that this, because the burden is so severe, because there are so many park zones. And just take the city of Chicago, for example. The state conceded in CHIRES that there were over 600 park zones in the city. And they conceded that that would prohibit the possession of firearms in, I quote, the vast acreage of the city of Chicago. Now, we have over 900 school zones. So if you take that reasoning in CHIRES that says that this ban is too severe because it would cover most of the acreage in the city and apply it to the school zone ban, this constitutes an even greater burden than in CHIRES. But you're saying, if I understand you correctly, that under the Concealed Carry Act, that prohibits the carriage of weapons on the property of schools, hospitals, churches, right? Correct. Right? Public housing. So if that's constitutional, isn't it just about the same burden as 1,000 feet from that property? Well, I can't make that call. I mean, the legislature is the one doing the legislative facts when they're drafting the laws. And that new law, that current law, has not been challenged for its constitutionality yet. But the old version has been challenged. And that old version of the law in CHIRES, the court said, is unconstitutional. Now, the court did mention that one of the problematic aspects of the unconditional ban within 1,000 feet was that there's no signage. There's nothing to tell people when they're entering or exiting, when they could be in violation of the law or not violation of the law. Doesn't signage have something to do with it? I'm sorry. If the legislature decided, all right, we're going to put signs up so people will know, don't come in this area because it's a protected area, isn't that a measured response to the need to protect sensitive locations and the need for law-abiding citizens to carry weapons? Well, the measured response has already been taken. In 2015, the legislature went back to the drawing board and they amended the statute. So the legislature found that the right balance between gun rights and the protection of children was to still have that 1,000-foot buffer zone, which excludes felons, juveniles, people without boy cars, mentally ill, excludes all those people who pose the risk to the protection of children, excludes them from carrying firearms within the zone, while still preserving a limited right for law-abiding individuals. Now, another thing that the Chires Court found was particularly troubling about the version of the statute that we're talking about today is not only the lack of notification aspect, but also that for the people who live within these zones, people that live within 1,000 feet of a school, well, in Chires it was a park, people that live within 1,000 feet of a park, that they would essentially lose their Second Amendment rights from the moment they step out of their house and get into their car. Again, I go back to the Concealed Carry Act that you don't seem to have a problem with. If somebody lives next door to a school, when they walk outside their house, they're right there. Right, but we're not challenging the Concealed and Carry Act here today. We're not challenging the amended version of the UUW statute today. We're challenging the statute that was at issue in Chires, and we're looking to Chires to see, is the reasoning in Chires applicable to this law at issue today? And it is. And for the scores of people who live within these zones, these school zones, they would have to disassemble their weapons, put them into a container every time they leave their private property. Now, Aguilar-Moseley says that those individuals have the right to possess weapons in those areas, in their cars, on the streets, in the public way. Aguilar-Moseley has already said that. So the Chires court says, wait a minute, this conflicts with Aguilar-Moseley because we're excluding the vast majority of the acreage in the entire city, saying that people don't have a right to carry arms in areas that we've already said that they do. Well, one of the problems with the 1,000-foot ban was that the legislature just picked it. It's similar to federal bans in sensitive places that have been upheld. But there's no fact-based rationale for saying 1,000 feet is a good limit. If the legislature can validly establish a buffer zone and does so with a nuanced study of what area is necessary, then doesn't that impact somebody with a FOID card the same as what you're saying the legislature can't? If you live next to a school and the legislature says, okay, we can't do 1,000 feet, but we're going to undertake a study and we're going to create a buffer zone of 250 feet around every school in the city of Chicago. Somebody who lives next to a school is going to be in the same position that you're hypothesizing for somebody having to disassemble their weapon to even walk outside. Well, if they had a concealed and carry license under this new version of the UUW statute, under the new version, they cannot violate the school zone ban by coming within 1,000 feet of a school. They cannot. A law by the door with a concealed and carry license under this new version cannot violate the school zone. But they also have to have a FOID card, too, correct? Correct. And I just want to point out, because you mentioned federal cases and other cases that upheld these 1,000 feet school zone bans, and the state in its supplemental brief cites the federal statute, United States v. Redwood, that's the case that they cite that upheld the federal statute, and Hall v. Garcia that upheld the California school zone ban, and the California school zone ban is modeled after the federal ban. But in those cases, and this is what I really want to stress here, the federal school zone ban and the California school zone ban are not at all like the school zone ban at issue in this case. Those laws are like the current UUW statute that has been amended since Aguilar, Moore v. Madigan, and Mosley. So the state is wrong about that. The federal law and the California law both contain an exception for licensed individuals. The problem that Chiray said we have with the former statute that's at issue today is that it does not have an exception for licensed individuals. So those cases do not help the state at all, Your Honors. If anything, those cases show what a constitutional school ban law looks like. It has an exception. It has an exception for law abiding adults, like the UUW statute has now, the amended version, which is not at issue in this case. And I just want to remind the court along that note that this court does not have to come up with a fix for this statute. The court does not have to come up with an idea of a new buffer zone or anything like that. This statute is defunct. It has not been in operation for years. The legislature has already deemed it fit to make this statute less restrictive, more narrow than it already is. And we have the amended version of the statute now. And this court has the opportunity to look at the amended version and see what changes were made to bring this statute into constitutional compliance. And what they did was they added an exception. And that is the problem that Chiray identified in Chiray's categorical prohibition. So this case is just like Chiray's. Individuals who live within the school zone, Chiray said that it would be a chilling effect. It would have a chilling effect on the Second Amendment right if everybody was always in jeopardy of whether or not they're accidentally driving into a school zone or walking into a school zone. That that would have a chilling effect. And in this case, because there are so many more school zones than park zones, the chilling effect would be even greater. So the only question that remains for this court after Chiray's is whether the state has shown through specific data that there is a close fit between the former UUW statute and the state's interest in protecting children. And haven't we done that here in that what was presented in Chiray's was school data. And here we do have a school case. So why isn't that sufficient? Because the data that the state presents is general data. It's general data about violence in the 1990s. For instance, the state points out that there were 158 guns confiscated on or near public grounds in Chicago in 1992 to 1993. But that data does not show who these guns were confiscated from. And that's very important because if, for example, these guns are confiscated primarily from juveniles, from felons, from people without FOIA cards, from the mentally ill, and if there really could have been, then a categorical prohibition that prohibits everybody, including law-abiding adults, is not justified. Now, Chiray's says that the correlation between the state's data and the goal here has to be more than just a relationship. It has to be more than just, okay, these statistics may be related to violence and, you know, safety of children. They have to show more than that. Chiray's says that they have to show an increased burden. They have to show almost strict scrutiny. So they have to show that there is, and I quote, a close fit between the law and the goal here. And the stats that the state has presented do not show a close fit because of that reason. The state also presents data regarding juvenile violence and the increase in juvenile arrests for weapons violations. But that doesn't show a close fit between a categorical prohibition, either, because juveniles could be prohibited from carrying guns with a more narrow law, like the law we have now. It still prohibits juveniles. It still prohibits felons. It still prohibits people who don't have FOIA cards. It still prohibits the mentally ill. It still prohibits the people who actually pose the risk to the safety of children. And so as I stated, this court has the benefit of looking at the amended statute because the amended UUW statute constitutes precisely what is a close fit. It preserves the right to protect yourself in public for a segment of law-abiding individuals in the state while still protecting children from those who pose the most risk. What would be so burdensome if every time someone who possesses a gun and has a license has to put it in a case when they travel? What's so burdensome about that? What's burdensome about it is that Aguilar identified these public areas that people travel in their cars as a place where confrontation is more likely to occur. So Aguilar and Mosley, if you put those two together, they say that the place where you have the risk of being confronted or the need for self-defense, the need to use your Second Amendment right, it's not inside your house. It's in the public way, when you're in your car, when you're walking on the street, when you're going through rough neighborhoods, on your way to work, whatever the case may be. So Aguilar and Mosley have already identified those areas as areas where you have a core Second Amendment right to protect yourself in public. Yeah, but you still have your gun. I mean, it's with you. But it's not ready to use. It's not accessible. In a case, it's closed up. The bullets aren't in there. If confrontation were to come your way, you'd have no chance because you've got to worry about unlocking a case, putting together a gun, and all of that. And so that's the problem that Aguilar and Moore identified. And even in Heller, which struck down a law that required people to keep their weapons unloaded and disassembled, that does not protect Illinois citizens' right to protect themselves in confrontation. That's not realistic. The gun needs to be ready, you know, readily accessible. It needs to be ready to use. So if this court… What are you asking this court to do, Ms. Ware? I'm asking this court to find that the former UUW statute, the 2012 statute that Mr. Green was convicted of, that is no longer in operation today, that that statute, which prohibits the carriage of firearms within a thousand feet of the school, that that is unconstitutional, and vacate his convictions.  Thank you. Good morning, Mr. Spilberg. Good morning again, Your Honors. Counsel spoke extensively about the similarities between this case and the Supreme Court's decision in Chirez, but what she ignored were the core distinctions as to why it is not controlling in this manner. Most significantly, what the court stressed, what the only court stressed in Chirez, was that it was involving the thousand feet of a school. It was involving the carriage of a weapon within a thousand feet of a park. The court recognized that parks are not the types of locations, or at least may not be, that are similar to schools, courthouses, and other areas where there is no Second Amendment right to carry. And the reason why I'm stressing that point is because, as Howell recognized, as Ampelow recognized, as Mosley recognized, there are certain areas where the core Second Amendment right does not exist. Schools are the prime example of that type of area. But the legislature has since amended the statute to remove that. Oh, yes, Your Honor. Well, not entirely, obviously. As you pointed out, even under the Concealed Carry Act, a concealed carry licensee cannot carry a gun in a school without the permission of the school itself. But the reason why I stress this is that what Chirez tells us is that the closer the conduct gets to core Second Amendment behavior, the lower the burden on the government to establish the necessity. That elevated intermediate scrutiny is lessened as you get closer and closer to the core Second Amendment. But what you would have here is a case worse than Chirez because there are over 900 schools, and you would hardly be able to walk the streets of Chicago. Your Honor, yes, I recognize that. And you concede that, as it was conceded. I do not in any way dispute what counsel stated about the number of schools. Because there's no exceptions under this version, it would consume and make really an inapplicable hell of it. Your Honor, and that's where I have to disagree. I don't believe it would make it inapplicable at all because, as Heller recognized, obviously, that schools are outside of the core zone of Second Amendment behavior. What the legislature is entitled to do is to determine that the best way to keep guns out of schools is to keep guns away from schools. And that's what the safe zone areas are intended to do, to keep the guns farther away from the schools. If it's overly broad, where you can, in fact we have it, you're saying with the amendments, we have exceptions that would permit still to keep to 1,000 feet and not impinge so readily on Second Amendment rights. So I don't, you want us to say that if we keep, if we say that, if we affirm, then anyone with a gun in the city of Chicago would be probably within 1,000 feet at any one time during this period of time near a school. And it seems that that is overly broad. Your Honor, I appreciate what you're saying. I mean, just to clarify what our position is, you are correct. The statute has since been amended, so we are definitely looking backwards to a time period, six years now almost as to when it occurred, as to whether or not this particular defendant committed a crime and whether or not that crime was constitutional at the time. I don't believe that we can extrapolate to many, many people outside of that because I know very few cases at all involving this particular statute, either before Aguilar or post-Aguilar. So, yes, the legislature has amended the statute to clearly be in compliance with the Seventh Circuit's directive in Moore v. Madigan, to clearly be in compliance with the Illinois Supreme Court's directive in Peeble v. Aguilar. But I don't believe that there are significant cases involving the statute. Well, there is. There's one very significant case, and that's what brings you here today. And so – Excuse me. I should have said significant numbers of cases. I'm sorry. But it doesn't matter because we have a case as close to these facts as you possibly can, and we have to follow what the Illinois Supreme Court said. So you need to convince us, it seems to me, why Sherez is not precedent for what we do here. And thank you, Your Honor. That's what I was just about to attempt to do. As you pointed out, all of the evidence that was offered to the Illinois Supreme Court in the Chiros case was involving schools. At the time the legislature adopted the safe zone provision under the UUW statute, it was well aware and cited in the debates the ongoing problems of school shootings, of people coming into schools and shooting. The Lorry Dam shooting in particular was prominent in the legislature's mind. We have had, unfortunately, since then, a spate of school shootings, both very recently and over the past 20-plus years. And so the legislature's goal, and this is what the evidence shows that we cite in our brief, which was presented to the Illinois Supreme Court, what the legislature was addressing was the fact that guns are too prevalent in and near schools. And so because of that, the legislature can set up what is the safe zone. The safe zones serve a purpose of providing a protective buffer to keep guns away from it, and law-abiding citizens know that. And in fact, the facts of this case show that Mr. Green was aware of what the rule was because after he drove away and came back, his gun was disassembled and was placed in a case, and the magazine was separate. So he knew what the requirements were, even within that. There was no dispute, no lack of knowledge in this case. The other point I would just like to make, it's been my experience. I think what Ms. Ware was arguing was that the danger that the legislature is addressing is the danger presented by felons and juveniles and people without FOID cards coming into schools. The Illinois Supreme Court hasn't said the legislature can't affect those people, but they have to balance. So if 1,000 feet is good for juveniles and felons and nobody who can lawfully be in possession of a firearm, why is the same zone appropriate for a law-abiding citizen with a FOID card who historically has not presented the danger of walking into a school and shooting it up? Well, Your Honor, I think we can look to the recent news stories of people who had no history of either mental illness or criminal conduct walking into schools and shooting up. But they weren't lawfully in possession. I mean, these were minors in most cases who weren't lawfully in possession of firearms. I believe some of them were, Your Honor. I believe that they were lawfully in possession of firearms. And I think the legislature of any state, but in particular of Illinois, can take that fact into consideration to decide what is necessary and best to protect the citizens of Illinois, particularly the most vulnerable ones, students at school. And that's what the legislature intended to do with the statute from the start. It was trying to maintain that protective buffer zone to keep the guns away from the schools because of the risk of the fear of having guns close, because you never know what could happen between juvenile and youth violence. As we know, it's been well recognized at this point, juveniles are impulsive, and having guns near them can cause a greater danger. We're not talking the defendant here as a security guard. He had all the licensing. He knew the laws as you stated. And we need to follow Suresh. And Suresh says when you have no exceptions, and it's possible to have exceptions, it's overly broad. I mean, there are ways we know to cut this down. For example, the idea that we know where it begins. We know it begins at the school, but we don't know where it ends. So you could be driving two or three blocks from a school, and you could be in the zone and not even realize the school's nearby. That happens to all of us, I'm sure. Every day in a neighborhood we're not familiar with, we could drive by a school. The only thing I would say, Your Honor, is it's my experience, that the school zones are often identified usually for speeding as opposed to... Well, usually right near the school, but not necessarily two or three blocks away. I think that there's at least some signage typically in the city of Chicago that's a school nearby for speeding, for students crossing, things like that, that there is quite different than parks in that regard. But I am acknowledging what the Supreme Court said and the difficulty of this case. But the distinctions can't be ignored either. The Supreme Court's discussion of the general realities of youth violence and dangers to students in that being a close fit to parks doesn't fit well here, because the evidence which is clearly in the record supporting the legislature's decision-making does fit directly with the concept of keeping guns away from schools. And so the question for this court, Your Honors, is, is there a close enough fit? Has there been a demonstration of the problem between the guns in and near schools and the legislature's clear desire and the government's strong public interest in keeping guns away from them? And that's the difficult question for Your Honors. Admittedly, it's a difficult question. But the problem is that the legislature, the Illinois legislature, much like legislatures of other states and the federal government, have recognized the importance of having these school zones, these buffer zones. But as Ms. Ware pointed out, the federal statute is much different. The California statute is much different. And it had the exemptions that would have made permissible. And that's why it's been upheld. We don't have any exemptions. My recollection of the Redwood and the Hall cases are that the court didn't stress these exemptions for licensees in their decision. Instead, what the court stressed was, particularly in the Redwood case, out of the northern district here, was that the strong governmental interest in establishing a safe zone. And the reason why that's important is that in Redwood in particular, Mr. Redwood did not have a license. But he did have a core Second Amendment right. And so if we're talking about an individual with a core Second Amendment right, the fact that he does or does not have a license is almost a distraction. Because Mr. Redwood, if he had a core Second Amendment right to carry a gun out in public, even if he wasn't licensed to do so separately by the state, then being within that safe zone, the 1,000-feet buffer area outside of school, was something that the federal government had the right to recognize and prohibit. Much like Mr. Green in this case, he didn't have a license to carry a gun out on the street because we didn't offer them at that time, admittedly. But the core Second Amendment right doesn't extend to that area. And that's why that sort of shifting sands of intermediate scrutiny that CHIRA has recognized is important here and earns a distinction between this case and the 1,000-feet of a park. Because the schools have so much of a heightened area under the Second Amendment where there is no Second Amendment right, the closer you get to them, the lesser of a burden there is to establish the necessity of the point. I read Redwood this morning, and I disagree that your interpretation is being too narrow. I do think that the Court was looking at the statute as a whole and that's why it drove that decision. Your Honor, as I stated, this is not an easy case. It's a difficult argument. None of us like the situation with the schools and the tragedies that occurred, obviously. And we need to try to do something, but we also need to recognize other rights and how is there a way that all these rights can be melded. And was this constitutional at the time? Your Honor, I completely understand the point. And that's why I stressed the difficulty of your job in trying to decide this, to sort of balance those areas. As counsel stated, the legislature has amended the statute since then, and so the ramifications, I'll be honest, the ramifications of a ruling in favor of the defense in this time would not have serious consequences to the general public because we have a statute which isn't that issue, which has been resolved. And the Supreme Court recognized that in charge. But the ultimate question, the core question of what is the legislature's authority to address the problem of guns near schools is what the core question that this court has to answer. We believe that the legislature had the authority to create and craft the statute that it did back in 1993 and that was in effect at the time of the offense in this case in 2012. I recognize, however, the closeness of the case and the difficulty of the analysis that Chiras has left this court to engage in. It's close, but we shouldn't follow it? Your Honor, as I said, I believe that it is distinct in significant points, primarily the distinction between the parks and the schools because schools have always been recognized as areas outside the ambit of the Second Amendment, whereas parks are not really in that same category. And so because of that, the elevated intermediate scrutiny that was applied in Chiras shouldn't apply here in the same regard. The shifting sands, the shifting level shouldn't apply here. And then on top of that, the evidence which is presented in the brief, which was the basis of the legislature's decision in the first place in order to protect the schools, to create that buffer zone, to keep guns away from schools, to keep guns out of schools by keeping them away from schools, is what the legislature is. I would also just point out to this court, there is a difficulty in squaring the burden that exists in these cases as well because as Chiras recognizes, all statutes are presumed constitutional and that the challenger bears the burden of proving they're constitutional. While at the same time, when we're dealing with intermediate scrutiny, the burden falls to the state to prove the legitimacy of the decision-making. I can't square those two burdens and how they fit. In Chiras, it was easy to do that because the circuit court had declared the statute unconstitutional and the state was appearing before the Illinois Supreme Court as the appellant. Today, however, I'm here as the appellee. I am defending the constitutional statute whereas my opponent bears the burden as the appellant to prove the unconstitutional, to overcome their presumption. How this court squares those two contradictory burdens, I couldn't tell you. But I do believe that it is a problem in the constitutional analysis that the Supreme Court has expected the appellate courts to engage in. And you're asking this court to do what? Your Honor, we would ask this court to affirm the conviction in this case and to hold that the statute as it existed in 2012 was constitutional. Thank you. Ms. Ware, some brief rebuttal. Thank you, Your Honors. I just want to mention the state says that United States v. Redwood Court that this court did not stress the exception as a reason why the federal law is constitutional. But that is incorrect. If you look at Section 2B of United States v. Redwood, it points out that this is why the Second Amendment rights are protected, because of this exception. It says, The statute includes various other exceptions allowing for the continued possession of firearms in a school zone under certain circumstances. Taken together, these exceptions conscientiously restrict the reach of the statute and preserve the core component of the Second Amendment. So that exception is what preserves the core component of the Second Amendment. Also, I just want to mention the state was saying that there are certain signs when you enter school zones and things of that nature. But even if there were signs all around each and every school zone in the city and in the state, under CHIRES, this law would still be too burdensome because it does not have an exception. And the state identifies that the statute was amended at the directive of Aguilar in those cases. And so that is an inference here that the former statute was unconstitutional. Because the constitutional infirmity identified in Aguilar in those cases has been fixed. So if anything, that is an indication that the former statute was unconstitutional. And finally, I just want to mention that Mr. Green is a law-abiding adult. He was over 21. He had a FOIA card. He had no prior convictions. The gun was covered up by his coat. The only way that the school attendant was able to see it was, he said, when the wind would blow the coat back and he would see that the gun was in a holster. As soon as Mr. Green became aware that there was an issue, he went to his car, disassembled the gun, put it in the case. He was otherwise a law-abiding individual. And under CHIRES, that's who we should be concerned about, is people who are law-abiding adults, who are trying to comply with the law, who do not pose a risk to children, who want to be able to defend themselves in public if necessary, that those are the groups of individuals that we have to strike this balance with. So as I stated earlier, there is nothing wrong with this buffer zone as long as there is an exception to it. What would your response be to the state questioning what burden you have in convincing us? How would you describe that burden? Well, actually, the state at this point has the burden of showing that there is a close fit between the categorical school zone prohibition in 2012 and the goal of protecting children. And the way that CHIRES says the state has to do that is by presenting detailed statistics that show that the law is a close fit. Now, the state has presented statistics that at best show a relationship. But this is not a rational basis test. The Supreme Court has already said that this test is almost strict scrutiny. And I just want to remind us that strict scrutiny means that they have to show that this is the least restrictive means, that this is the most narrow way of achieving the goal. And CHIRES says that the scrutiny that applies in this case is almost like that. Intermediate. Elevated intermediate, not just intermediate. Elevated intermediate. So it has to be a close fit. So it has to be tailored to the risk. And the stats that the state has identified in this case do not show that close fit that CHIRES requires. So for these reasons and the reasons stated in my original opening brief and reply brief, I'd ask that this Court find the statute unconstitutional and vacate Mr. Green's convictions. Thank you. Thank you. Ms. Ware and Mr. Spellberg, the Court would like to thank you for your briefs and your arguments. The issues you've presented today are issues that this society has been working with and will have to continue to work with. I'm also going to say I am very pleased that I had the opportunity to preside over this argument. As some of you may or may not know, this will be the last time that I sit in this Court, and I must say that I did enjoy the argument today. This matter is going to be taken under advisement, and this Court stands in recess.